| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY** <br> Caption in Compliance with D.N.J. 9004-2(c) <br><br> Robert E. Nies, Esq. (rnies@wolffsamson.com) <br> **WOLFF & SAMSON PC** <br> One Boland Drive <br> West Orange, NJ 07052 <br> Tel: (973) 325-1500  Fax: (973) 530-2212 <br><br> *Attorneys for Karen L. Gilman,* <br> *Chapter 11 Trustee* | |
| In re: <br><br> 15-35 HEMPSTEAD PROPERTIES, LLC and JACKSON 299 HEMPSTEAD LLC, <br><br><br><br> Debtors. | Chapter: 11 <br><br> Case Nos. 10-43178 (GMB) and <br>                10-43180 (GMB) <br><br> *Jointly Administered* <br><br> Judge: Hon. Gloria M. Burns |

**EMERGENT MOTION OF KAREN L. GILMAN, AS CHAPTER 11 TRUSTEE, SEEKING ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 9019 AND BANKRUPTCY CODE SECTIONS 105, 363 AND 364 (I) APPROVING DEBTORS' SETTLEMENT WITH YORK CLAIMS SERVICE, INC., OF A PRE-PETITION PROPERTY DAMAGE CLAIM (THE "SETTLEMENT") AND, AS PART OF THE SETTLEMENT, AUTHORIZING PAYMENT OF AN ADJUSTER'S FEE TO PROPERTY ADJUSTMENT CORPORATION; (II) AUTHORIZING THE TRUSTEE'S IMMEDIATE USE OF CASH COLLATERAL GENERATED BY THE PROPERTY (DEFINED BELOW) AS EMERGENCY INTERIM FINANCING; (III) AUTHORIZING THE TRUSTEE'S USE OF EMERGENCY INTERIM FINANCING *NUNC PRO TUNC* TO MAY 10, 2011; (IV) AUTHORIZING THE TRUSTEE, PURSUANT TO § 364 OF THE BANKRUPTCY CODE, TO FINANCE INSURANCE PREMIUMS *NUNC PRO TUNC* TO MAY 23, 2011; AND (V) SETTING A HEARING DATE FOR FINAL APPROVAL OF THE TRUSTEE'S USE OF CASH COLLATERAL AND THE ADVANCE OF ADDITIONAL FUNDING FOR OPERATIONS, PURSUANT TO § 364 <u>OF THE BANKRUPTCY CODE</u>**

   TO:    THE HONORABLE GLORIA M. BURNS
           UNITED STATES BANKRUPTCY JUDGE

Karen L. Gilman, Esq., the Chapter 11 Trustee (the "**Trustee**") for 15-35 Hempstead Properties, LLC and Jackson 299 Hempstead LLC (together, the "**Debtors**" and hereinafter, the "**Debtor**"), by and through her attorneys Wolff & Samson PC, respectfully submits this emergent motion (the "**Motion**") for entry of an Order, pursuant to Sections 105, 363 and 364 of Title 11 of the United States Code, 11 U.S.C. §§101 et seq. (the "**Bankruptcy Code**") and R. 9019 of the Bankruptcy Rules (i) approving Debtors' settlement with York Claims Service, Inc., of a pre-petition property damage claim (the "**Settlement**") and, as part of the Settlement, authorizing payment of an adjuster's fee to Property Adjustment Corporation; (ii) authorizing the Trustee's immediate use of cash collateral generated by the Property (defined below) as emergency interim financing; (iii) authorizing the Trustee's use of emergency interim financing *nunc pro tunc* to May 10, 2011; (iv) authorizing the Trustee, pursuant to § 364 of the Bankruptcy Code, to finance insurance premiums *nunc pro tunc* to May 23, 2011; and (v) setting a hearing date for final approval of the Trustee's use of cash collateral and the advance of additional funding for operations, pursuant to § 364 of the Bankruptcy Code. In support of the Motion, the Trustee respectfully represents as follows:

## JURISDICTION AND VENUE

1. The Court has jurisdiction over the Motion, pursuant to 28 U.S.C. §§157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding, pursuant to 28 U.S.C. §157(b)(2).

2. The statutory predicates for the relief sought herein are Sections 105, 363 and 364 of the Bankruptcy Code.

\

## PRELIMINARY STATEMENT

3.  The Motion has emerged because of the critical and vital need to obtain funding for the triage undertaken by the Trustee over the past two weeks. In short, the Motion seeks the use of funds to maintain minimal health and safety operations at the Debtor's real property commonly known as The View.

4.  Thus, the Motion seeks emergent authorization to use existing rents and the advance by Debtors' lender of an insurance settlement to fund current operations, including payment of insurance premiums, payroll, critical repairs, and similarly emergent needs.

5.  The Motion necessarily seeks court approval of the insurance settlement and a contingent fee incurred to achieve the settlement, because the Debtor never sought court approval of these transactions. It necessarily seeks to finance one insurance premium, while paying several others, because the Debtor inexplicably failed to pay premiums due for liability, property, and workers compensation policies. Finally, the Motion authorizes a combined use of cash collateral and additional bank financing to maintain minimal operations. The agreement to provide the essential financing, however, is conditional upon the Trustee's retention of an auctioneer to sell the Debtor's property (defined below).

6.  This is triage for a critically wounded Debtor. Without emergent consideration of these matters, the Trustee will have insufficient funds to adequately operate and may be forced to close the tenanted building. For these reasons, the Trustee respectfully requests that the Court grant the Motion in its entirety.

## BACKGROUND

**General Background**

2708674.2

7. On October 26, 2010 (the "**Petition Date**"), the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**").

8. On November 16, 2010, an Official Committee of Unsecured Creditors (the "**Committee**") was duly appointed, pursuant to section 1102 of the Bankruptcy Code, to represent creditors holding unsecured claims in these chapter 11 cases (the "**Chapter 11 Cases**"). [Docket No. 38]. The Committee retained the law firm of Fox Rothschild as its counsel. [Docket No. 53].

9. On November 24, 2010, the Court entered an order authorizing joint administration of the Chapter 11 Cases. [Docket No. 60].

10. The Debtors are the owners of real property located at 101 Boardwalk in Atlantic City, New Jersey, that consists of 359 residential apartment units and four commercial units (the "**Property**").

11. By Order dated May 10, 2011, the Bankruptcy Court approved the appointment of the Trustee [Docket No. 202]. By Order dated May 18, 2011 the Bankruptcy Court approved the retention of Wolff & Samson PC, as attorneys for the Trustee [Docket No. 222].

**Debtors' Settlement with York Claims Service, Inc.**

12. Prior to the Petition Date, on or about September 10, 2010, 15-35 Hempstead Properties LLC, as insured, entered into a contract (the "**Public Adjuster Contract**") with Property Adjustment Corporation, as public adjuster, whereby the parties agreed that Property Adjustment Corporation would advise and assist the insured in the settlement of a casualty insurance claim arising from a lightning strike at the Property in June, 2010. Attached hereto as **Exhibit A** is a true and correct copy of the Public Adjuster Contract.

4

13. Pursuant to the Public Adjuster Contract, the insured agreed to pay Property Adjustment Corporation a contingent fee of thirty-five (35%) percent of the amount paid by York Claims Service, Inc. ("**York**"), the insurer for the loss at the Property.

14. The Debtors subsequently renegotiated the contingent fee of Property Adjustment Corporation to twenty (20%) percent of the amount paid by York. Upon information and belief, the Debtors failed to seek Bankruptcy Court approval of the Public Adjuster Contract, the settlement with York, or the renegotiated contingent fee.

15. On or about April 25, 2011, York issued a check in the amount of $175,000, representing the gross settlement payable to the Debtors, the Debtors' secured lender, New York Community Bank ("**NYCB**"), and Property Adjustment Corporation. Attached hereto as **Exhibit B** is a true and correct copy of the settlement check.

16. On or about May 3, 2011, Property Adjustment Corporation advised the Debtors' principal, Steven Kates, that pursuant to the Public Adjuster Contract and the parties' subsequent agreement to reduce the contingent fee, the net amount due to 15-35 Hempstead Properties LLC was $140,000 (the "**Net Settlement Proceeds**"), which amount would be held in escrow by Property Adjustment Corporation and released on May 10, 2011. Upon information and belief, the Net Settlement Proceeds have not been released as of the date of this Motion. Attached hereto as **Exhibit C** is a true and correct copy of Property Adjustment Corporation's May 3, 2011 letter.

17. NYCB asserts a first priority lien and security interest in substantially all assets of the Debtors, including the Net Settlement Proceeds. NYCB has agreed to advance to the Trustee for operations the Net Settlement Proceeds, pursuant to Section 364 of the Bankruptcy Code.

**Debtors' Default Under the Consent Order dated April 13, 2011**

18. By Consent Order entered by the Bankruptcy Court on April 13, 2011 (the "**Consent Order**") [Docket No. 162], the Debtors, the Committee and NYCB agreed that the Debtors would be permitted to use cash collateral through July 30, 2011, subject to the terms of the Consent Order and the budget attached thereto as Exhibit "A".

19. NYCB asserts and alleges that, prior to May 10, 2011, the Debtors defaulted on the terms of the Consent Order, which, at least in part, lead to this Court entering an order appointing the Trustee. NYCB asserts that its consent for use of its cash collateral by Debtors is no longer operative; NYCB does, however, consent to the Trustee's Motion (for the reasons more fully explained below).

**Condition of the Debtors' Property**

20. The Trustee has inspected the Property and has observed its operations since being appointed in these Chapter 11 Cases, first on May 16th and then again on May 20th. The Trustee also has consulted with various professionals concerning the physical condition of the Property. The Trustee has conferred with, among others: (i) various on-site employees of the Debtors who maintain a daily presence at the Property, and are in charge of security, maintenance and housekeeping; (ii) Philip Rhyne, the on-site interim property supervisor for the Trustee and the prior supervisor for Saligman & Decker, Debtors' Court authorized Property Manager; (iii) the bank officer at NYCB; (iv) NYCB's counsel; (v) Creditors Committee's counsel; and (vi) Carl Freedman of FC Development Group LLC, a potential property manager for the Property.

21. The Trustee has been advised there are certain immediate and urgent repairs that are necessary to keep the compressor, the boiler system and the chiller operating at the Property and to avoid what may be the imminent malfunction of this machinery. Absent the emergent

preventative repairs to this machinery, the Property may immediately be without hot water and/or proper ventilation or air conditioning. The cost of such preventative repairs is presently unknown, but likely will exceed $10,000.00.

22. Moreover, during the Trustee's most recent inspection of the Property on Friday, May 20, 2011, evidence of criminal mischief and vandalism to an elevator at the Property necessitated an investigation by the Atlantic City Police Department. The cost to repair the elevator was $2,560.00.

23. Shortly before the Trustee was appointed, the Debtors and their professionals acknowledged that the rental income generated by the Property should be approximately $160,000.00 a month, but projected it would only be $120,000.00 a month. To date, Debtors' projections have not proven to be accurate and rental income has declined dramatically. Nonetheless, monthly operating expenses are in conformity with projections previously provided by the former Property Manager of between approximately $160,000.00 to $175,000.000 a month. Without the use of NYCB's cash collateral and additional NYCB financing, there are insufficient funds to pay monthly operating expenses.

24. Moreover, during the post-petition period, the Debtors have failed to pay certain public utilities providing critical services to the Property such as: (i) Atlantic City Sewerage Company (waste water services); (ii) Atlantic City Electric Company (electricity services); Atlantic City Municipal Utilities Authority ("ACMUA") (water and fire services); and (iv) South Jersey Gas Company (natural gas). These post petition administrative expenses exceed $200,000.00. The Trustee is presently negotiating payment terms of the administrative claims of the utility providers, while trying to assure that tenants at the Property receive uninterrupted service.

25. Also on Friday, May 20, 2011, while examining the Debtors' on-site records in the management offices at the Property, the Trustee found a Notice of Intent to Cancel Commercial Property Insurance for non-payment of premium due to Premium Financing Specialists Corp. ("**Premium Financing**"), a company which finances the Debtors' insurance premiums. The date of cancellation is May 27, 2011. Attached hereto as **Exhibit D** is a true and correct copy of the Premium Financing invoice with a date of cancellation of May 27, 2011.

**Debtors' Failure to Maintain General Liability and Commercial Property Insurance**

26. On Monday May 23, 2011, in order to avoid cancellation of the commercial property insurance, the Trustee made a direct payment by electronic funds trasnfer from the Trustee Operating Account in the amount of $3,712.37 on the Premium Financing invoice.

27. While attending to the payment for the property insurance funding, the Trustee was advised by Premium Financing that the Debtors had an additional financing agreement for liability insurance and that a payment in the amount of $3,179.74 for that financing had been due on May 15, 2011. Accordingly, the Trustee authorized that payment by electronic funds transfer as well.

28. On May 23, 2011, while the Trustee arranged for a change of endorsement of the commercial property, workers compensation and general liability policies to name the Trustee as the insured, Debtors' insurance broker, United Risk Management (the "**Insurance Broker**"), advised the Trustee for the first time that the Debtors' insurance carrier, Landmark American Insurance Co. ("**Insurance Carrier**"), on May 10, 2011 had issued a notice of cancellation of insurance policy (the "**Notice of Cancellation**"). That Notice of Cancellation stated that property insurance coverage would be cancelled at 12:01 A.M. on May 24, 2011, for non-

8

payment of premium. Attached hereto as **Exhibit E** is a true and correct copy of the Notice of Cancellation issued directly by the Insurance Carrier.

29. The Notice of Cancellation from the Insurance Carrier was a result of the Debtors' failure to pay an increased insurance premium which arose because of the Debtors' underreporting of the square footage of the Property, as revealed by an inspection of the Property conducted by the Insurance Carrier.[1]

30. While the Debtors initially disputed the premium increase, an invoice was issued on April 5, 2011, by the Insurance Broker for the premium increase which was ultimately agreed to by the Debtors. Attached hereto as **Exhibit F** is a true and correct copy of the April 5, 2011 invoice issued by the Insurance Broker. The premium increase was never paid, nor was it financed by the Debtors. On May 10, 2011, the Insurance Carrier issued the Notice of Cancellation. (*See* Exhibit "E").

31. On May 23, 2011, the Trustee entered into a financing agreement (the "**Financing Agreement**") with Premium Financing to finance $4,926.09 of the increased premium of $19,704.35. Attached hereto as **Exhibit G** is a true and correct copy of the Financing Agreement. Without the Financing Agreement, the Property would have no insurance.

32. The Trustee was compelled to finance the insurance premiums, rather than make a direct payment in full from the Trustee Operating Account, because only Premium Financing would accept an electronic funds transfer. Neither the Insurance Broker nor the Insurance Carrier would agree to an electronic funds transfer, and there was insufficient time to arrange for another method of payment or to secure insurance from another provider or carrier.

---

[1] In December 2010, the Insurance Carrier sent an inspector to the Property who determined that the Property size was not 175,000 square feet, as represented by the Debtors, but, rather, was 206,778 square feet. The increased size resulted in an increased annual premium of $19,705.35.

2708674.2

33. Accordingly, the Trustee authorized an electronic funds transfer of $14,778.26, representing the premium payment with a financing charge of $49.57. The payment was made on notice to Committee's counsel, the U.S. Trustee and with the express written approval of NYCB.

34. On May 24, 2011, the Trustee learned that the Debtors were not financing workers compensation insurance. Rather, Guard Insurance Group ("**Guard**") permitted the Debtors to make installment payments for workers compensation insurance. On May 24, 2011 the Trustee made payment to Guard on the installment due on May 25, 2011, in the amount of $1,011.00.

## RELIEF REQUESTED

35. By the Motion, the Trustee seeks the entry of an Order (i) approving Debtors' Settlement with York Claims Service, Inc., of a pre-petition property damage claim and, as part of the Settlement, authorizing payment of an adjuster's fee to Property Adjustment Corporation; (ii) authorizing the Trustee's immediate use of cash collateral generated by the Property *nunc pro tunc* to May 10, 2011; (iii) authorizing the Trustee's use of emergency interim financing; (iv) authorizing the Trustee, pursuant to § 364 of the Bankruptcy Code, to finance insurance premiums *nunc pro tunc* to May 23, 2011; and (v) setting a hearing date for final approval of the Trustee's use of cash collateral and the advance of additional funding for operations, pursuant to § 364 of the Bankruptcy Code.

36. NYCB consents to the Motion and the Trustee's immediate use of the cash collateral on an interim and emergency basis. NYCB also has authorized financing, in its sole and absolute discretion, up to a total of $400,000.00 (inclusive of the funding provided from the Net Settlement Proceeds), expressly subject to: (i) an acceptable budget to be prepared by a

property manager to be retained by the Trustee and approved by the Court; and (ii) the Trustee's retention of an auctioneer to market and sell the Debtors' real property at a public auction (subject to approval from this Court and in accordance with the Bankruptcy Code and Rules).

37. The Trustee shall expeditiously file with the Court separate retention applications for: (i) a property manager to prepare a budget for the use of cash collateral until the Property is sold at auction; and (ii) an auctioneer to conduct a public auction of the Property as soon as practicable. The Trustee also will promptly file an appropriate motion to approve procedures to sell the Property by public auction.

38. The Trustee anticipates that there are immediate urgent repairs that are necessary and that the remainder of the interim emergency financing will be used to pay on-going costs of operation, including current utility bills, employee payroll, salaries to the bookkeeper and interim superintendent, both of whom are independent contractors, U.S. Trustee fees and ongoing maintenance costs.

## BASIS FOR THE RELIEF REQUESTED

39. Pursuant to §105(a) of the Bankruptcy Code, "the court may issue any order, process, or judgment that is necessary to carry out the provisions of this title." 11 U.S.C. §105(a). Under §105(a) of the Bankruptcy Code, the Court has expansive equitable powers to fashion any order or decree that is in the interest of preserving or protecting the value of the debtor's assets. *See Bird v. Crown Convenience (In re NWFX, Inc.)*, 864 F.2d 588, 590 (8th Cir. 1988) ("The overriding consideration in bankruptcy… is that equitable principles govern."); *In re Chinichian*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code.")

**The Settlement with York and the Payment of the Adjuster's Fee to Property Adjustment Corporation Should Be Approved as in the Best Interests of the Debtors' Estates**

40. Bankruptcy Rule 9019(a) authorizes a bankruptcy court to approve compromises or settlements: "On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." See Fed. R. Bankr. P. 9019(a).

41. Approval of a proposed compromise or settlement is within the sound discretion of the court. *See, e.g,. Newman v. Stein*, 464 F.2d 689, 692 (2d Cir. 1972) ("the approval of a compromise is a discretionary order which can be reversed only upon a clear showing of an abuse of discretion"); *Fischer v. Pereira (In re 47-49 Charles St. Inc.)*, 209 B.R. 618, 620 (S.D.N.Y. 1997) ("[a] bankruptcy court's decision to approve a settlement should not be overturned unless it is manifestly erroneous and a clear abuse of discretion").

42. The standard for evaluating a proposed settlement is for the court to make an "informed, independent judgment as to whether [the] settlement is 'fair and equitable' and 'in the best interests of the estate.'" *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991)(*quoting Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).

43. Here, it is in the best interests of the Debtors' estates for the Court to approve the Settlement with York pursuant to which the Debtors' estates shall receive $140,000 in Net Settlement Proceeds as financing from NYCB and Property Adjustment Corporation shall retain $35,000 as an adjuster's fee (constituting a twenty (20%) percent of the gross proceeds of the Settlement) for its efforts in obtaining the Settlement.

44. As explained above, rental income from the Property is materially below projections and will not enable the Trustee to continue operating the Property.. The Net

2708674.2

Settlement Proceeds will provide the Trustee with an immediate and necessary source of operating funds to keep the building open and maintain a place of residence for the tenants.

**The Trustee's Use of Cash Collateral Should Be Authorized *Nunc Pro Tunc* to May 10, 2011, and the Trustee's Financing of the Insurance Premiums Should Be Approved *Nunc Pro Tunc* to May 23, 2011**

45. Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than the ordinary course of business, property of the estate. . . ." 11 U.S.C. § 363(b)(1). Moreover, a debtor may only use cash collateral if an entity that has an interest in such cash collateral consents. 11 U.S.C. § 363(c)(2)(A).

46. Section 364 of the Bankruptcy Code permits a trustee to obtain credit to preserve the estate or to further the debtor's rehabilitation efforts. A trustee or debtor in possession may obtain unsecured credit in the ordinary course of business without court authorization pursuant to §364(a) of the Bankruptcy Code. *See* 11 U.S.C. §364(a). Pursuant to §364(b), with court approval, after notice and a hearing, the trustee may obtain unsecured credit other than in the ordinary course of business. *See* 11 U.S.C. §364(b).

47. Section 364(d)(1) of the Bankruptcy Code provides as follows:

> The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—
> (A) the trustee is unable to obtain such credit otherwise; and
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted....

*See* 11 U.S.C. 364(d)(1).

48. The Trustee submits that authorization to use cash collateral, *nunc pro tunc* to May 10, 2011, is critical and in the best interests of Debtors' estates, because, without the use of cash collateral, the Trustee would not have been able to pay the weekly payroll that was due to

13

the employees at the time of her appointment, pay the insurance premiums that were due in order to continue property, liability and workers compensation insurance policies, operate the Property and protect the tenants through negotiations to provide uninterrupted utility services, all in an attempt to produce the best recovery possible for the creditors and the estate.

49. The Trustee further submits that financing of the insurance premiums should be approved, *nunc pro tunc* to May 23, 2011, because it was literally hours before cancellation of the insurance, at 12:01 A.M. on May 24, 2011, that the Trustee discovered the Debtors complete failure to pay its premiums or to otherwise maintain insurance coverage. Without the payments made, and the financing of one of the premiums, the Property would have been left uninsured.

**A Hearing is Necessary for Final Approval of the Trustee's Use Of Cash Collateral and the Advance of Additional Funding for Operations**

50. A hearing is necessary for final approval of the Trustee's use of cash collateral and to borrow from NYCB an amount up to $400,000 (inclusive of the Net Settlement Proceeds) to continue operating the Property. NYCB's advance of additional funding for operations will enable the Trustee to preserve assets of the Debtors' estates until such time as an auction occurs. Indeed, NYCB's consent to finance operations and to allow use of its cash collateral is expressly conditioned upon the Trustee's filing an application for the retention of an auctioneer..

**NOTICE**

51. Notice of this Motion has been given to: (i) the Office of the United States Trustee; (ii) the Debtors and Debtors' counsel; (iii) counsel to the Official Committee of Unsecured Creditors; (iv) counsel for Atlantic City Electric Company; (v) counsel to New York Community Bank; (vi) all secured creditors; (vi) all parties who filed a Notice of Appearance in this case; and (vii) Property Adjustment Corporation c/o Kevin J. Kaufmann, S.P.P.A. The Trustee submits that, under the circumstances, no further notice is required.

## **NO PRIOR REQUEST**

52. No prior request for the relief sought herein has been made to this or any other court.

**WHEREFORE**, the Trustee respectfully requests that the Court grant the relief sought herein, together with such other and further relief as the Court deems just and proper. A proposed form of Order is submitted herewith.

        Respectfully submitted,

        WOLFF & SAMSON PC

        */s/ Robert E. Nies*
        Robert E. Nies, Esq. (rnies@wolffsamson.com)
        One Boland Drive
        West Orange, NJ 07052
        Tel: (973) 325-1500 Fax: (973) 530-2212

        *Attorneys for Karen L. Gilman, Chapter 11 Trustee*

Dated: May 25, 2011

2708674.2